**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **LAURIE NORBERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:07-1268** |
| **LIFE INSURANCE COMPANY OF** | ) | **Judge Trauger** |
| **NORTH AMERICA and** | ) | |
| **ELECTRONIC DATA SYSTEMS** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Pending before the court is a Motion for Judgment on the Administrative Record Or, Alternatively, Motion for Summary Judgment (Docket No. 52) filed by defendant Electronic Data Systems Corporation, to which plaintiff Laurie Norberry has responded (Docket No. 55), and Electronic Data Systems Corporation has replied (Docket No. 57).   For the reasons explained herein, the defendant's motion, which the court reviews as a summary judgment motion, will be granted.

**I.    INTRODUCTION**

On December 21, 2007, plaintiff Laurie Norberry filed this action against her former employer, Electronic Data Systems Corporation ("EDS"), and Life Insurance Company of North America ("LINA")  pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq*., alleging that she is entitled to short-term disability benefits, long-term disability benefits, and health care benefits.  (Docket No. 1).  The plaintiff also claims that, in denying her short-term disability, long-term disability, and health

1

care benefits, EDS and LINA breached their fiduciary duties to her.

On March 10, 2008, LINA filed a motion for summary judgment. (Docket No. 20). The court granted LINA's motion on December 10, 2008, finding that LINA was not a proper party with respect to Norberry's claim for short-term disability benefits because EDS reserves the final decision with respect to all claims. (Docket Nos. 59 and 60). The court also found that the EDS short-term disability plan is a payroll practice not governed by ERISA; thus, the court dismissed the plaintiff's ERISA claims for denial of short-term disability benefits. (*Id.*) Finally, with respect to plaintiff's long-term disability benefit claim, the court determined that the plaintiff had not exhausted her administrative remedies and dismissed that claim as well. (*Id.*)

Defendant EDS now seeks judgment on the administrative record or, alternatively, summary judgment in its favor, contending that (1) it is not a proper party with respect to the plaintiff's claim for long-term disability benefits; (2) in any event, the plaintiff has not exhausted her administrative remedies with respect to a claim for long-term disability benefits; (3) the EDS short-term disability policy is a payroll practice exempt from ERISA; and (4) to the extent that the plaintiff alleges breach of contract claims, the plaintiff is not entitled to short-term disability benefits because no enforceable promise of such benefits was made to her, she did not meet the definition of "disabled", and she cannot show that she sustained damages as a result of the denial of disability benefits. Having reviewed the parties' submissions and the governing law, the court determines that summary judgment is the more appropriate procedure for resolving the defendant's pending motion.

## II.  FACTS[1]

### A.  Governing Plan Documents and Language

In or about February 2005, LINA entered into a "Claim Consulting Agreement" with EDS that was effective retrospectively to January 1, 2004.  (Ex. B to Docket No. 20).  The Agreement states that "Employer sponsors a self-funded salary continuance payroll practice (the "Plan") for

its employees."   This Claim Consulting Agreement is in effect for Policy Number SHD 985005, which is EDS' short-term disability plan.

Pursuant to that Agreement, LINA acts as a claims consultant for EDS.  EDS relies upon the determinations made by LINA regarding whether employees meet the definition of "disabled" under the terms of the policy.   EDS reserves the final decision with respect to all claims:

> Employer shall be responsible for making the final decision with respect to all claims, for communicating such decisions and the amount payable to the claimants and Consultant, and for funding and issuing all benefit payments.

(Ex. B to Docket No. 20, p. 6).   Likewise, all liability for payment of claims made under the plan rests with EDS:

> This is not a contract of insurance and Consultant shall not underwrite any risk of the Plan.  All liability for payment of claims made under the Plan shall rest with Employer.  Consultant acts only as the provider of the services described in this Agreement

---

[1]Unless otherwise noted, these facts are drawn from the administrative record submitted and supplemented by EDS and all related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

3

and, with respect to Plan participants, acts only as the agent of the
Employer.

(*Id*. p.4).

EDS' 2005 U.S. Benefits Handbook ("Handbook") governs the determination of Ms.

Norberry's eligibility for short-term disability benefits. (Handbook, pp. 82-89). The long-term

disability policy is a separate document. (Docket Entry No. 49-1 at pp. 99-120). EDS' short-

term disability policy provides that employees who have worked for EDS for six or more years

are eligible for up to twenty-six weeks of short-term disability benefits at 100% of the

employee's pay. (Handbook, pp. 82-83). The EDS Handbook states that the short-term

disability policy is not intended to be an employment contract or to provide any special rights or

privileges. (Handbook, p. 82). The EDS short-term disability policy specifically states it is

intended only as a guideline and that EDS retains a unilateral right to modify the short-term

disability policy at any time, without notice. (*Id).*

The short-term disability policy sets forth the employee's responsibilities in applying for

benefits. The policy states, among other things:

> It is your responsibility to furnish the necessary information to . . .
> CIGNA AbilityReturns regarding your inability to report to work.
> Appropriate medical documentation and other pertinent
> information from a Medical Provider may be required to
> substantiate the expected duration of your continued absence due
> to a medical reason . . .
>
> . . . medical information/documentation to substantiate your
> disability must be provided to CIGNA AbilityReturns in order to
> determine your FMLA coverage and/or STD benefit eligibility,
> and process your claim.

4

(Handbook, pp. 82-83).[2]  The Handbook further states that CIGNA AbilityReturns "will require

proof of continued disability."  (Handbook, p. 84).

The Handbook sets forth the following definitions pertinent to this case:

> **Definition of Disability**
> Under the EDS Short-Term Disability Plan, you are considered
> Disabled if, solely because of Injury or Sickness, you are:
> receiving Appropriate Care and Treatment from a Medical
> Provider on a continuing basis; and,
> 1.  unable to earn more than 80 percent of your covered earnings
> from working in your
> Regular Occupation; and
> 2.  unable to perform all the material duties of his or her Regular
> Occupation.

> **Definition of Regular Occupation**
> [T]he occupation the Employee routinely performs at the time the
> Disability begins.  In evaluating the Disability, CIGNA
> AbilityReturns will consider the duties of the occupation as it is
> normally performed in the general labor market in the national
> economy.  It is not work tasks that are performed for a specific
> employer or at a specific location.

(Docket No. 49-1  p. 6).

Both the 2005 and 2006 EDS short-term disability plans state that a claim is reviewed for

eligibility for long-term disability benefits only if the claimant has been out of work for a certain

time period:

> If you have been continuously unable to work due
> to a medical reason for at least 12 weeks and the
> medical condition is expected to continue beyond
> 26 weeks, your situation will be reviewed by
> CIGNA AbilityReturns to determine if you are
> eligible to receive benefits under EDS' Long-Term

---

[2]CIGNA AbilityReturns is EDS' third-party administrator for its benefits program.  (Docket
No. 53 n.2).  CIGNA AbilityReturns is a part of LINA, and the two names may be used
interchangeably.  (*Id.*)

> Disability program. Given STD benefits end after
> 26 weeks, early communication and coordination
> with CIGNA AbilityReturns in this situation is
> beneficial.

(Document No. 49-1, pp. 9, 46).

The EDS long-term disability plan states:

> If you are out on disability through the integrated disability
> program, your claim will be automatically evaluated for LTD
> eligibility if you are disabled for more than three months.
>
> Failure to return the application materials may affect your
> ability to receive LTD benefits.  In addition to completing the
> forms, you must also obtain a physician's statement that provides
> your medical condition, including documentation such as test
> results, office notes and treatment plans. All completed forms and
> supporting documentation must be sent to Cigna AbilityReturns,
> as outlined in your packet.

(Document No. 49-1, p. 88).  Under EDS' long-term disability policy, a claimant who qualifies

for long-term disability benefits is entitled to 60% of her salary, to a maximum monthly benefit

of $3,000.  (Handbook, p. 87).  Under certain circumstances, which the plaintiff contends are

applicable in her case, an employee may receive up to 70% of their basic pay through the

purchase of supplemental long-term disability insurance.   Under the long-term disability policy,

persons eligible for long-term disability benefits may continue health care benefits for up to

thirty months from the date of disability, but such persons are responsible to pay EDS for

monthly premiums for such coverage.  (Handbook, p. 88).

    **B.**    **Norberry's Claims and Medical History**

    Plaintiff Laurie Norberry was employed by EDS from May 1985 until October 1997.

She worked at the Saturn Automobile Manufacturing Facility in Spring Hill, Tennessee.  In

6

2003, she began to experience back problems in the cervical or neck region. She underwent her first cervical spine surgical procedure in November 2003. She was out of work for approximately eight to ten weeks. During this time she received short-term disability benefits through her employer-provided benefit plan.

In February 2004, Ms. Norberry resumed her employment at EDS, returning gradually over a period of weeks. By March 2004, she was working full-time hours again.

In August 2005, she underwent a second cervical spine surgery. Her last day of work prior to surgery was July 29, 2005. On or about August 1, 2005, Ms. Norberry filed an application with LINA for short-term disability benefits under the EDS policy.

On August 3, 2005, LINA notified Ms. Norberry that she had fifteen days from the date of the letter to provide LINA with objective medical documentation and data to support a disability. Based on the information submitted by or on behalf of Ms. Norberry, LINA determined that she was eligible to receive short-term disability benefits through her employer-provided plan, beginning August 1, 2005.

Ms. Norberry returned to work at EDS on October 18, 2005, on a part-time basis, and she continued to work until February 2006. From October 17 or 18, 2005, until February 20, 2006, she was paid four hours' disability pay and four hours' salary per day while working this reduced schedule.

### C.     LINA Determines Norberry Is No Longer Qualified for STD Benefits

On December 14, 2005, LINA notified the plaintiff that it needed information to determine her functional ability and to evaluate whether she continued to qualify for short-term disability benefits after November 30, 2005. (Docket No. 53, Ex. 1 to Rogers Decl. at p. 5). LINA reviewed the additional information forwarded by Ms. Norberry, and on December 29,

7

2005, found she was not qualified to receive ongoing short-term disability benefits. (*Id.* at pp. 5-6). In support of its determination, LINA cited relevant definitions from EDS' short-term disability policy. (*Id.* at p. 6). LINA stated that it had reviewed the medical information submitted by Ms. Norberry, but had determined that the information did not support Ms. Norberry's inability to work more than six hours per day and did not address Ms. Norberry's level of functionality. (*Id.* at pp. 6-7). LINA concluded: "In light of the fact that the medical documentation no longer supports that you are unable to perform the duties of your occupation, benefits beyond November 30, 2005, are being denied." (*Id.* at p. 7).

### D. Norberry Appeals LINA's Determination

Ms. Norberry appealed LINA's December 29, 2005 decision, stating that her treating physician, Dr. Michael McNamara, had previously submitted documentation regarding Ms. Norberry's condition. (*Id.* at p. 9). Shortly thereafter, on January 24, 2006, LINA affirmed its prior denial of continuing short-term disability benefits, for the same reasons, after again reviewing the information in Ms. Norberry's medical file. (*Id.* at pp. 8-9). Following this determination, LINA informed Ms. Norberry that she had exhausted her rights of appeal. (*Id.* at p. 9).

On February 9, 2006, Dr. McNamara notified CIGNA by letter that he "would like to remove her from the work force beginning on February 20" and that he "would like for her to remain off work for approximately one month" to see if her spinal cord could recover from its cervical myelopathy. (Docket No. 44, AR000293). He advised LINA that, "[a]t this point in time for the foreseeable future until this condition resolves, this patient will be unable to work at the full-time basis." (*Id.*).

### E. LINA Grants Norberry A Second Appeal

On April 3, 2006, despite the exhaustion of her rights to appeal the denial of her short-term disability claim, LINA advised Ms. Norberry in a telephone conversation that "a second appeal may be considered if you were able to provide new medical information not previously considered that was relevant to the time period your benefits were denied, 11/30/05." (Docket No. 53, Ex. 1 to Rogers Decl. at p. 10).

In response, Ms. Norberry submitted an office note dated March 17, 2006. (*Id.*) LINA considered this information, but on April 10, 2006, LINA again denied Ms. Norberry's application for short-term disability benefits, finding that the office note did not relate back to November 30, 2005. (*Id.*)

## F.    LINA Grants Norberry A Third Appeal

In May 2006, LINA granted Ms. Norberry a third appeal and reviewed Ms. Norberry's short-term disability claim application for a fourth time. (*Id.* at pp. 11-12). On May 18, 2006, after reviewing the information submitted, LINA determined once more that the medical information provided by Ms. Norberry and/or her physicians did not support a finding that Ms. Norberry was continuously unable "to function in a sedentary occupation on a full time basis since November 30, 2005." (*Id.* at p. 12).

Following this determination, Ms. Norberry chose to use her accumulated vacation benefits, and she was paid vacation time from June 16 through July 23, 2006. (Docket No. 53, Ex. 3 to Rogers Decl. at p. 2). After her vacation time was exhausted, Ms. Norberry's manager placed her on a paid leave, continuing her full salary and benefits for over one year, until October 23, 2007. (Docket No. 53, Harrington Decl. ¶ 9; Exs. 3 and 4 to Rogers Decl.). EDS allows its managers discretion to continue their supervisees' pay and benefits while absent from the workplace. (Handbook, p. 106).

9

### G.     LINA Grants Ms. Norberry a Fourth Appeal

In February 2007, although under no obligation to do so, LINA considered additional medical information submitted by Ms. Norberry regarding her claim for short-term disability benefits. (Docket No. 53, Ex. 1 to Rogers Decl. at p. 13).   LINA again determined Ms. Norberry was not entitled to short-term disability  benefits because the additional information did not address Ms. Norberry's continuous disability from December 2005 through June 2006. (*Id.*)

### H.     Norberry Seeks Fifth Appeal

On March 20, 2007, Ms. Norberry sent a letter to LINA requesting yet another appeal. (*Id.* at p. 14).   LINA determined that the new information provided by Ms. Norberry did not support a disabling condition, the remainder of the information provided had already been reviewed by LINA, and Ms. Norberry's appeal rights had already been exhausted.  (*Id.*).

### I.     LINA Considers Norberry's Latest Appeal

Finally, on August 16, 2007, LINA reviewed the seventh request from Ms. Norberry regarding short-term disability  benefits. (*Id.* at p. 15).   Finding that all information received did not "directly correlate to [Ms. Norberry's] lack of functional ability back to November 2005," LINA reconfirmed its denial of STD benefits.  (*Id.*).

Ms. Norberry was placed on an unpaid leave with benefits from October 23, 2007, until Ms. Norberry's employment with EDS was terminated on November 9, 2007, approximately twenty-four months after her short-term disability  benefits had expired. (Docket No. 53, Ex. 3 to Rogers Decl. pp. 3-4).   She was paid 50% disability pay and 50% regular salary for the period of October 18, 2005, through February 20, 2006, while working part-time.  (Docket No. 53, Rogers

10

Decl.; Docket No. 54, Ex. 1 to EDS' Statement of Material Facts, p. 6).

**J.      Norberry Seeks Clarification**

In October 2007, Ms. Norberry complained in writing to EDS because she "thought that EDS was involved in the denial of her short-term disability and long-term disability benefits." (Docket No. 31 at 2).   EDS responded by written correspondence informing her that, because the EDS long-term disability plan is fully-insured through CIGNA, CIGNA is the claims fiduciary for the plan and retains the sole discretion to determine entitlement to benefits under the terms and conditions of the plan.  (Attach. 4 to Docket No. 31).

Annie Hong, a LINA senior operations representative, testified by affidavit that the Ms. Norberry's claim has not been evaluated to determine eligibility for benefits under the terms of the long-term disability plan because she never filed a claim for long-term disability benefits and has never appealed any alleged denial of long-term disability benefits.  (Docket No. 22 at 2). Each letter sent to Ms. Norberry from LINA/CIGNA between December 29, 2005 and August 16, 2007 specifically references her "claim for Short-Term Disability benefits."  (*See* Exh. A to Docket No. 20).  None of the letters reference any claim by Ms. Norberry for long-term disability benefits.  (*Id.*)

Ms. Norberry maintains that she was not required to make a separate application for long-term disability benefits because she was disabled and received short-term disability benefits for more than ninety days.  She points to a letter she received from Jerry Fullmer, an EDS "client delivery manager," dated October 9, 2007, stating:

> As you are aware, you were denied short-term disability (STD)
> benefits beyond November 30, 2005, because CIGNA determined
> you did not meet the definition of disability under the EDS STD
> Plan.  Similarly, you were denied long-term disability (LTD)
> benefits because CIGNA determined you did not meet the

11

definition of disability under the EDS LTD Plan.

(Attach. 3 to Docket No. 31).    Ms. Norberry subsequently filed this action.

## III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. 988011 Ontario, Long-term disability.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.' " *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).


If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law.  *See Williams v. Ford Motor* Co., 187 F.3d 533, 537-38 (6th Cir. 1999).  To preclude summary judgment, the non-moving party "must go beyond the pleadings

and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted.   *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

IV.    **ANALYSIS**

   A.    **Ms. Norberry's claim for long-term disability benefits fails as a matter of law.**

EDS seeks summary judgment in its favor as to the plaintiff's claim for long-term disability benefits against EDS.   The court previously dismissed Ms. Norberry's claim for long-term disability benefits against LINA, having determined that the plaintiff failed to exhaust her administrative remedies with respect to any alleged claim for such benefits.  (Docket No. 60). Ms. Norberry has not challenged the court's ruling.  Moreover, she now concedes that EDS is not a proper party to her claim for long-term disability benefits.  (Docket No. 55 at 11). Consequently, the court will grant EDS' motion for summary judgment as to this claim  and dismiss the plaintiff's long-term disability benefits claims against EDS with prejudice.

13

**B.     Ms. Norberry is not entitled to continued health care coverage.**

In her Complaint, Ms. Norberry contends that EDS is obligated to pay the employer portion of her health insurance premiums.  Her contention is premised on Ms. Norberry's belief that she is entitled to long-term disability benefits.  Under the governing policy, if Ms. Norberry is entitled to long-term disability benefits, she is entitled to purchase health insurance at the cost to active employees for a period of twenty-four months from the date of long-term disability. EDS pays a portion of the premiums and employees pay a portion of the premiums, but benefits continue only if the employees pay their share of the premiums.

In its motion for summary judgment, EDS argues that Ms. Norberry's claim for continued health care coverage fails for several reasons.  EDS' arguments are well taken.

First, as noted above, under the EDS long-term disability policy, EDS is required to pay its portion of a disabled employee's health insurance premiums when the employee pays his or her portion.  The evidence shows, however, that Ms. Norberry never applied for long-term disability benefits.   Nor was she ever qualified to receive long-term disability benefits.  Nor was there a period of time in which the plaintiff paid her portion of the health insurance premiums and EDS did not pay its share.

Second, because Ms. Norberry did not qualify for continuing short-term disability benefits, but was provided with health benefits for the duration of her twenty-month leave, Ms. Norberry has not sustained damages with respect to health care benefits.   EDS continued Ms. Norberry's health care benefits from August 2005 until October 2007 under the same terms as if she were an active employee.  Once separated, EDS provided Ms. Norberry with a letter consistent with the requirements set out in the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), informing her of her ability to purchase health care coverage.  (Ex. D to

14

Docket No. 53).   EDS paid Ms. Norberry her full salary and benefits for twenty months after she left work in February 2006, an amount totaling nearly $90,000.   As a result, EDS has already paid Ms. Norberry significantly more than it would have been required to pay in health care premiums had Ms. Norberry qualified for long-term disability benefits.

Finally, Ms. Norberry has conceded that her health care coverage claim "may very well be a moot issue at this point" because the period of time for long-term disability health care coverage would have expired in early 2008.  (S*ee* Docket No. 55 at 11 n.3).  For these reasons, the court finds that Ms. Norberry's claim for continued health care coverage fails as a matter of law.

### C.   Ms. Norberry's short-term disability and breach of fiduciary duty claims under ERISA fail as a matter of law.

#### 1.   Payroll practices are appropriately excluded from ERISA.

Ms. Norberry brought her claims pursuant to ERISA.  (Compl. ¶ 4).   However, EDS contends, as did LINA previously, that Ms. Norberry's short-term disability benefits are not governed by ERISA, and EDS seeks summary judgment on all claims brought pursuant to ERISA for that reason.

Former defendant LINA previously argued that Ms. Norberry's claims under the EDS short-term disability plan are not governed by ERISA because the disability plan at issue is a payroll practice and not an employee welfare benefit plan subject to ERISA.   In addressing LINA's argument, the court specifically considered whether payroll practices are appropriately excluded from ERISA.  (Docket No. 59, Mem. Op. at pp. 8-9).

By its specific language, ERISA only applies to "employee benefit plans," which are defined as any "employee pension benefit plan" or "employee welfare benefit plan." 29 U.S.C. §

15

1002(3).  Under ERISA, the terms "employee welfare benefit plan" and "welfare plan" are

defined as:

> any plan, fund, or program which has heretofore or is hereafter
> established or maintained by an employer or by an employee
> organization, or by both, to the extent that such plan, fund, or
> program was established or is maintained for the purpose of
> providing for its participants or their beneficiaries, through the
> purchase of insurance or otherwise . . . benefits in the event of
> sickness, accident, disability, death, or unemployment . . . .

29 U.S.C. § 1002(1).

Regulations issued by the Secretary of Labor specifically exclude "payroll practices"

from the definition of "employee welfare benefit plan."  29 C.F.R. § 2510.3-1(b).  "Payroll

practices" are defined by the regulations as:

> Payment of an employee's normal compensation, out of the
> employer's general assets, on account of periods of time during
> which the employee is physically or mentally unable to perform
> his or her duties, or is otherwise absent for medical reasons (such
> as pregnancy, a physical examination or psychiatric treatment) . . .
> .

29 C.F.R. § 2510.3-1(b)(2).   The rationale for this exclusion as explained by the Supreme Court

is:

> In enacting ERISA, Congress' primary concern was with the
> mismanagement of funds accumulated to finance employee
> benefits and the failure to pay employees benefits from
> accumulated funds . . . . To that end, it established extensive
> reporting, disclosure, and fiduciary requirements to insure against
> the possibility that the employee's expectation of the benefit would
> be defeated through poor management by the plan administrator.
> Because ordinary vacation payments are typically fixed, due at
> known times, and do not depend on contingencies outside the
> employee's control, they present none of the risks that ERISA is
> intended to address. If there is a danger of defeated expectations, it
> is no different from the danger of defeated expectations of wages
> for services performed--a danger Congress chose not to regulate in
> ERISA.

16

*Massachusetts v. Morash*, 490 U.S. 107, 115 (1989). Thus,"participants in a plan funded from the general assets of the employer–as opposed to those funded by a trust–do not face a threat of non-payment of their benefits based on the improper management of the trust; rather the security of their benefits is based on the financial health of the employer." *Hall v. ESIS, Inc*., 2005 WL 2033500, at *3 (E.D. Mich. Aug. 19, 2005)(citing *Morash*). Relying on the authority given to the Secretary of Labor and *Morash* and other binding precedent, the court previously found that "payroll practices" as defined by 29 C.F.R. § 2510.3-1(b)(2) are not "employee welfare benefit plans" and therefore are not within the purview of ERISA. (Docket No. 59, Mem. Op. at pp. 8-10).

Ms. Norberry contends that the reasoning and conclusion in the court's December 10, 2008 ruling are incorrect. In particular, she maintains that 29 C.F.R. § 2510.03-1(b), which establishes the payroll practice exclusion from ERISA, is an unreasonable interpretation of 29 U.S.C. § 1002(1). However, in *Massachusetts v. Morash*, 490 U.S. 107 (1989), the Supreme Court found that "the precise coverage of ERISA is not clearly set forth in the Act" and that the Secretary made a reasonable determination that vacation pay paid out of the employer's general assets constitutes a payroll practice. *Id*. at 113.

Applying *Morash*, the Sixth Circuit Court of Appeals has affirmed a district court's finding that a short-term disability plan was a payroll practice not subject to ERISA because the benefits were paid from the employer's general assets. *See Langley v. DaimlerChrysler Corp*., 502 F.3d 475, 480 (6th Cir. 2007). Although Ms. Norberry challenges the Sixth Circuit's holding in *Langley*, the case remains binding precedent. Ms. Norberry has not distinguished *Langley* such that its reach does not extend to the instant case. The court is not persuaded to

17

alter its previous ruling on this issue.

        **2.**     **The EDS short-term disability plan meets the definition of a payroll practice and therefore falls outside the purview of ERISA.**

        After determining that payroll practices are appropriately excluded from ERISA, the court, in evaluating LINA's motion for summary judgment, surveyed the evidence before it at that time. That evidence included the Claims Consulting Agreement between EDS and LINA and testimony by a LINA senior operations representative. The court then concluded that the EDS short-term disability plan met the definition of a payroll practice and that Ms. Norberry had submitted no facts to the contrary. (Docket No. 59, Mem. Op. at pp. 10-11). Having so found, the court granted LINA's request for summary judgment as to Ms. Norberry's claims for denial of short-term disability benefits and breach of fiduciary duty under ERISA. (*Id.* at 11).

        In response to EDS' motion for summary judgment, Ms. Norberry challenges the court's prior finding that EDS' short-term disability policy is a payroll practice. Again, however, Ms. Norberry has submitted no facts warranting a different conclusion. It is undisputed that the EDS short-term disability policy pays compensation out of EDS' general assets for an employee's medical absence. Thus, the short-term disability policy fully complies with the regulation. The court stands by its prior ruling that the policy is exempt from ERISA as a payroll practice. *See Capriccioso v. Henry Ford Health Sys.*, 2000 WL 1033030, at **2-3 (6th Cir. July 17, 2000)(concluding that an employer's salary continuation benefits constituted a "payroll practice" excluded from ERISA, as "[t]he staff members are relying on the financial health of [the employer], not that of the long-term disability carrier, for payment of [benefits]"; noting that the employer never maintained records consistent with ERISA's requirements with respect to the plan at issue and had not submitted or filed any documents or forms with the Department of

18

Labor or Internal Revenue Service identifying or representing in any way that the plan constituted an employee welfare benefit plan under ERISA.   Ms. Norberry's claims for denial of benefits and breach of fiduciary duty under ERISA necessarily fail.[3]

**D.     Assuming that Ms. Norberry asserts a common law breach of contract claim, this claim too fails as a matter of law.**

Although Ms. Norberry has not expressly asserted a breach of contract claim, EDS maintains that, to the extent the court analyzes her short-term disability claim under contract law,[4] the claim fails for three reasons.

**1.     The EDS short-term disability policy does not constitute a binding contract.**

Ms. Norberry alleges that she was disabled and remains disabled within the meaning of the short-term disability policy, and that EDS breached the terms of the policy by failing to provide the plaintiff with continued benefits.  EDS contends, however, that no express or implied contract existed between Ms. Norberry and EDS.

A basic requirement of contract formation is that the parties mutually assent to be bound. *Sweeten v. Trade Envelopes, Inc.,* 938 S.W.2d 383, 385-86 (Tenn. 1996).   Absent a showing of mutual assent, a claim for breach of contract fails because no enforceable contract exists.

---

[3]Having determined that the plaintiff's claims cannot be brought under ERISA, it would be inappropriate for the court to consider EDS' instant motion as one for judgment on the administrative  record.  In addition, no administrative record exists as to the plaintiff's long-disability claim, which the court has found to be non-viable in any event.

[4]In response to EDS' summary judgment motion, the plaintiff states that she "believes that a contract exists."  (Docket No. 55 at 11 n.2).  EDS devoted a significant portion of its summary judgment brief to the issue of the plaintiff's contractual claims.  (*See* Docket No. 53 at pp. 10-16).

19

Tennessee courts have set "a high standard for establishing the existence of an

employer's specific intent to be bound . . . ." *Brown v. City of Niota, Tenn*., 214 F.3d 718, 721

(6th Cir. 2000).   In order to constitute a contract, an employee handbook must contain "specific

language showing the employer's intent to be bound by the handbook's provisions." *Rose v.*

*Tipton Cty. Public Works Dep't*, 953 S.W.2d 690, 692 (Tenn. Ct. App. 1997).  Conversely, a

clear contractual disclaimer evidences the employer's intent not to be bound.   *Rhea v. Dollar*

*Tree Stores, Inc.*, 395 F. Supp. 2d 696, 707 (W.D. Tenn. 2005) (stating there is "no clearer way

for an employer to express its intent not to be bound by an employee handbook's provisions than

the employer's specific statement that the handbook is not a contract or that the handbook should

not be construed as a contract.") (quoting *Adcox v. SCT Products*, 1997 WL 638275, at *4 (Tenn.

Ct. App. Oct. 17, 1997)).

Further, under Tennessee law, where an employer reserves its right to make

unilateral modifications to its policies, the policies cannot be considered a contract. *Clairborne*

*v.*

*Frito-Lay, Inc.*, 718 F. Supp. 1319, 1321 (E.D. Tenn. 1989); *see also Floss v. Ryan's Family*

*Steak Houses*, Inc., 211 F.3d 306, 315-16 (6th Cir. 2000) (holding that no contract exists where

one party reserves the unfettered right to make modifications). The unilateral right to modify

"precludes the handbook from being considered part of the parties' employment contract" unless

the policy contains "unequivocal language" showing the employer's intent to be bound by the

policy.   *Reed v. Alamo Rent-A-Car, Inc*., 4 S.W.3d 677, 688 (Tenn. Ct. App. 1999).

EDS contends that Ms. Norberry cannot prove that an employment contract existed

between her and EDS because: (1) she cannot show EDS had a specific intent to be bound; (2)

the short-term disability policy contains no guarantees; (3) the policy specifically states that it

20

does not constitute an employment contract; (4) the policy specifically states it is intended only as a guideline; and (5) the policy contains explicit language regarding EDS' unilateral right to modify the short-term disability policy.

True, the EDS short-term disability policy expressly states that it was not intended to create any contractual or other rights on the part of employees. (Handbook, p. 82). *See Rose*, 953 S.W.2d at 693 (holding that language indicating the rules were a "guide" undermined any argument that the rules created a binding contract). Specifically, the Handbook states: "[t]he STD Policy is used by EDS leaders to communicate the parameters of benefit eligibility in relation to short-term disabilities. This publication is only intended as a *guideline. None of the information contained herein is intended to give special rights or privileges to specific individuals* or to entitle any person to remain employed by EDS. . . . *Although some of the guidelines set forth herein may suggest, even strongly, that certain procedures or steps be followed, these procedures should not be interpreted as altering an individual's employment relationship and do not constitute an employment contract*." (Handbook, p. 82) (emphasis added). This express language demonstrates that the short-term disability policy was a guideline, not a guarantee or contract between the parties.

Further, the Handbook unambiguously states that "EDS retains the right to change, modify, suspend, interpret, or eliminate any provision in this publication, at any time, with or without notice." (*Id.*) Where one party reserves the right to make unilateral changes to an alleged "agreement," there can be no contract. *Floss*, 211 F.3d at 315-16; *Rhea*, 395 F. Supp. 2d at 708. An employer may insulate itself from implied contract claims by informing employees, as was done in the present case, that its policies are subject to change without notice. *Rose*, 953 S.W.2d at 693-94. By retaining its right to "rescind, add or change any of the policies,

21

procedures or benefits described" in the short-term disability policy, EDS communicated to employees that the STD policy was not a contract. *See Rhea*, 395 F. Supp. 2d at 708.

In *Tabor v. Electric Data Systems, Inc*., No. 03-70243, 2005 WL 1030418, at *8 (E.D. Mich. Apr. 27, 2005), a sister court determined that EDS' short-term disability policy is not a contract under Michigan law. Other district courts have found similarly, applying various states' laws. *See also Wilkes v. Electronic Data Systems, Corp*., 267 Fed. Appx. 661, 662 (9th Cir. 2008) (applying Arizona law); *Hirth v. Metropolitan Life Ins*., Co., 189 Fed. Appx. 292, 293 (5th Cir. 2006) (applying Texas law); *Diehl v. Electronic Data Systems, Corp*., No.1:07-CV-1213, 2008 WL 2705540, at *5 (M.D. Pa. July 10, 2008)(applying Pennsylvania law).

 EDS employees, including Ms. Norberry, were given notice that provisions of the employee handbook could change at any time. In light of the clear language advising Ms. Norberry and all other EDS employees that the disability benefits policies did not constitute a contract, the court finds that the plaintiff does not have any enforceable contract rights stemming from EDS' Benefits Handbook. Accordingly, EDS is entitled to summary judgment in its favor with respect to any claim Ms. Norberry makes for breach of contract.

 

 

      **2.**      **Ms. Norberry failed to submit the required documentation of disability and LINA appropriately denied continued benefits under the short-term disability policy.**

The EDS short-term disability policy states that short-term disability benefits will end when an employee is no longer disabled or able to provide sufficient medical documentation of a continuing disability. (Handbook at p. 83, Docket No. 53-7). An employee is "disabled" if she

22

is "unable to earn 80 percent of more of [her] covered earnings from working in [her] Regular Occupation" and is "unable to perform all the material duties of [her] Regular Occupation." (Docket Entry No. 49-1 at 11).

After surgery, Ms. Norberry returned to work on or about October 17, 2005. It is undisputed that Ms. Norberry worked at least on a part-time basis until some time in February 2006. After LINA notified Ms. Norberry in December 2005 that it needed information to determine her functional ability and whether she continued to qualify for continued short-term disability benefits, neither Ms. Norberry nor her physicians provided to LINA the necessary medical documentation validating her continued inability to work beyond November 30, 2005. All of the medical documentation submitted by Ms. Norberry or on Ms. Norberry's behalf relating to that time period does not support Dr. McNamara's opinion that Ms. Norberry was unable to perform her all of the material duties of her regular job; it does not explain how Ms. Norberry's medical problems affect and/or limit her ability to perform her job duties. The policy plainly states that it is Ms. Norberry's "responsibility to furnish the necessary information" to LINA regarding her "inability to report to work." (Handbook, p. 82). Because Ms. Norberry never submitted the necessary information showing she was "disabled" under the terms of the short-term disability policy beyond November 30, 2005, LINA was correct in determining that she was not entitled to continuing short-term disability benefits past that date. [5]

---

[5]As the court sees it, resolution of the critical issue identified by LINA, whether Ms. Norberry's restrictions and limitations were supported by the clinical information provided, could have been advanced by the undertaking of a Functional Capacity Evaluation ("FCE"). As the plaintiff points out and EDS does not dispute, there is no real evidence in the record as to the specific functional requirements of Ms. Norberry's position or how her alleged disability limits her ability to fulfill those requirements. Ms. Norberry's physician, Dr. McNamara, declined to order a FCE because he felt that Ms. Norberry would "self limit due to pain," thereby invalidating the results. However, LINA's Dr. Hatam indicated in June 2006 that such an evaluation would be

### 3. Ms. Norberry cannot show any damages arising out of the denial of continued short-term disability benefits.

Even if all of the plaintiff's factual allegations are true, assumes EDS, and the court finds that Ms. Norberry was disabled under the terms of the short-term disability policy after November 30, 2005, EDS maintains that Ms. Norberry cannot show that she sustained any damages and her breach of contract claim therefore fails.

Under Tennessee law, the basic elements of a breach of contract claim are: the existence of a contract, breach of that contract, and damages that flow from the breach. *See Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996). Thus, failure to establish damages is fatal to a breach of contract claim.

Here, the EDS short-term disability policy states that, if an employee qualifies, benefits may be paid for up to twenty-six weeks. (Handbook, p. 82). If Ms. Norberry had been granted short-term disability benefits after November 30, 2005, according to the terms of the policy, she could have continued to receive benefits until January 30, 2006, at which time her short-term disability benefits would have been exhausted. Despite the denial of short-term disability benefits after November 30, 2005, Ms. Norberry continued to receive 100% of her regular pay and benefits until October 23, 2007 – twenty months after she left work – *fourteen months longer* than she would have received under the short-term disability policy had she been qualified. Ms. Norberry admits that EDS has already paid her more than what she would be owed under the short-term disability policy.

---

helpful. Yet Dr. Hatam nor any LINA representative ever ordered the evaluation.

Nevertheless, because under the circumstances of this particular case, Ms. Norberry cannot show any damages resulting from the denial of her claim for continued short-term disability benefits, the court declines to remand the plaintiff's claim to LINA for the ordering of a FCE.

Throughout this litigation, Ms. Norberry has consistently maintained that, by proving she was disabled under the terms of the short-term disability policy, she would be automatically entitled to long-term disability benefits. However, this contention is inconsistent with the express language of the governing policies. Pursuant to the policy, employees may be automatically *evaluated* by LINA for long-term disability benefits after they have been approved for short-term disability benefits for a period of time. However, there is no automatic entitlement to long-term disability benefits simply because a claimant qualified for and received short-term disability benefits.

The facts show that Ms. Norberry has already been paid significantly more than the maximum possible benefits under EDS' short-term disability policy. Ms. Norberry has sustained no damages and therefore cannot recover on a breach of contract claim.

## V.     CONCLUSION

For the foregoing reasons, the court will grant defendant EDS' motion for summary judgment (Docket No. 52) and dismiss with prejudice the claims asserted against EDS by plaintiff Laurie Norberry.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge